[Cite as *State ex rel. Dunlap v. Indus. Comm.*, 2016-Ohio-8131.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio ex rel. Myong Dunlap, | : | |
| Relator, | : | |
| v. | : | No. 16AP-101 |
| Industrial Commission of Ohio and Ryan Michael, Inc., | : | (REGULAR CALENDAR) |
| | : | |
| Respondents. | : | |
| | : | |

D E C I S I O N

Rendered on December 13, 2016

**On brief:** *The Bainbridge Firm, LLC,* and *Carol L. Herdman,* for relator.

**On brief:** *Michael DeWine,* Attorney General, and *Patsy A. Thomas,* for respondent Industrial Commission of Ohio.

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

BROWN, J.

{¶ 1} Relator, Myong Dunlap, has filed this original action requesting this court issue a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to do the following: (1) vacate its order wherein the commission exercised its continuing jurisdiction over the motion filed by the Ohio Bureau of Workers' Compensation ("BWC") finding that she had been overpaid temporary total disability ("TTD") compensation and that the BWC was entitled to recoup that overpayment, pursuant to the fraud provisions of R.C. 4123.511(K), (2) vacate its subsequent order denying her request that the commission exercise its continuing jurisdiction to correct a

mistake of law, and (3) find there was no overpayment and/or that relator was not guilty of fraud.

{¶ 2}   This court referred the matter to a court-appointed magistrate pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals.  The magistrate issued the appended decision, including findings of fact and conclusions of law, and recommended that this court grant relator's request for a writ of mandamus. The commission and relator have filed objections.

{¶ 3}   In its sole objection, the commission argues the magistrate erred when she found the commission abused its discretion in declaring that only the TTD compensation for the closed period of March 1, 2011 through January 30, 2013 be recouped under the fraud provisions of R.C. 4123.511(K). The commission contends the magistrate has negated the commission's position as the trier of fact and has recommended the issuance of a writ of mandamus solely on her own conclusion that the version of the C-84 form relator signed between March 1, 2011 and January 30, 2013 did not inform relator that her unpaid activities were improper. The commission claims that the issue is not whether the form contained certain wording, but whether relator knowingly concealed her activity in order to receive benefits to which she was not entitled, consistent with the elements for civil fraud. The commission asserts that it relied on multiple C-84 forms in which relator attested she had not worked since 2008, videos showing relator walking through the store and climbing a ladder, relator's intentional downplaying of her activities and involvement at the store, and concealing the activities she was performing at King J.'s from the commission and her treating physician, which evinces her knowledge that her activities were prohibited while receiving TTD compensation.

{¶ 4} However, the magistrate's determination addresses the issue the commission claims is pertinent here: whether relator knowingly concealed her activities in order to receive benefits to which she was not entitled. In its order, the commission relied on the fact that the newer C-84 applications were modified to include that unpaid activities that directly earned income for someone else were considered "work" in order to find relator had knowledge of the falsity of her representations that she was not working. Given the commission's rationale, the magistrate found that the commission should have concluded that relator was overpaid only from the time she signed the modified C-84

application that included the broader definition of "work." The magistrate's reasoning addresses the issue of whether relator knowingly concealed her work activity, which directly relates to a required element of fraud. The magistrate found it could not be presumed that relator knowingly concealed her work activity until she signed the modified C-84 application with the expanded definition of "work" on January 31, 2013. The Supreme Court of Ohio has noted that, although "work" in this context is generally considered to be labor exchanged for pay, the exception that unpaid activities that directly generate income for a separate entity can be considered "work" "is not intuitive, nor is it within the realm of the average claimant's experience." *State ex rel. McBee v. Indus. Comm.*, 132 Ohio St.3d 209, 2012-Ohio-2678, ¶ 10. Thus, we find the magistrate did not err when she found the version of the C-84 form relator signed between March 1, 2011 and January 30, 2013 did not inform relator that her unpaid activities were improper, so relator could not have knowingly concealed her work activities until she signed the modified C-84 form with the expanded definition of "work" on January 31, 2013. The commission's argument is without merit, and we overrule its objection.

{¶ 5} In her sole objection, relator argues the magistrate erred when she found that relator knowingly committed fraud from January 31 to August 6, 2013 because there was insufficient evidence to support the finding that relator knew her actions constituted "work" inconsistent with the receipt of TTD compensation. Relator argues that, per the C-84 application, unpaid activity constitutes "work" only if it is "not minimal," and that phrase has not been defined by the BWC, commission, or any court. Relator contends that no discussion or analysis of whether her activities were more than minimal was undertaken by the commission. Thus, she claims there was not some evidence to support the commission's finding that she engaged in fraud for any portion of time questioned by the BWC.

{¶ 6} Although the commission did not make an explicit finding with regard to the "not minimal" requirement on the C-84 form, the finding is implicit, and we find there was some evidence to demonstrate that relator's work was not minimal. Although there is no explicit definition of "minimal," several cases have determined whether the activities in question were "minimal." In *State ex rel. Ford Motor Co. v. Indus. Comm.*, 98 Ohio St.3d 20, 2002-Ohio-7038, the court found the claimant's activities were minimal when he

hired workers to do the lawn care in his lawn care business, while his participation was limited to signing paychecks, fueling lawnmowers weekly, and driving the mowers onto a truck.

{¶ 7}  In *State ex rel. Perez v. Indus. Comm.*, ___Ohio St.3d ___, 2016-Ohio-5084, the court found the claimant's work at his auto repair business was not minimal when he was ordering and picking up automobile parts, scheduling appointments, looking under the hood of vehicles, answering the telephone, receiving payments from customers, and talking with customers—activities that were more than passive.

{¶ 8}  In *State ex rel. Meade v. Indus. Comm.*, 10th Dist. No. 04AP-1184, 2005-Ohio-6206, this court found that activities were not minimal when the claimant took an active and physically demanding role in a pizza business, conducting repairs, delivering pizzas, serving customers, and conducting various other work-related activities.

{¶ 9}  In *State ex rel. Cassano v. Indus. Comm.*, 10th Dist. No. 03AP-1227, 2005-Ohio-68, we found the activities were not minimal when the claimant continued to operate his car dealership, doing such tasks as performing mechanical work on cars and attending auto auctions.

{¶ 10} In *State ex rel. Honda of Am. Mfg. Co. v. Indus. Comm.*, 113 Ohio St.3d 5, 2007-Ohio-969, the claimant owned a scrapbook store and was observed answering a customer's questions, pointing out displays, and speaking on the telephone as well as once using the cash register. The court found the claimant's mere presence at the store did not itself disqualify her from receiving TTD compensation, and that even if she had engaged in some business activities, those activities were geared toward promoting goodwill and generated income only secondarily.

{¶ 11} In the present case, there was some evidence to demonstrate that relator's activities were not minimal.  Here, relator worked at the beauty supply store three to four days per week, worked from the opening of the store until closing, operated the cash register while standing behind the front counter, greeted customers, walked with customers throughout the store, assisted customers with locating items, moved and climbed a step ladder to reach an item, provided details about products to customers, bagged purchased items, and trained a new employee.  An employee for the business also told investigators that relator had told her that she had been working full-time at the store

for two to three years but was cutting her hours because of back pain. These activities were not minimal.  They were physically demanding and more than passive, as in *Perez* and *Meade* above. Relator's actions were also greater than being a "mere presence," as the court in *Honda* found to be minimal, given the physical and broad nature of her tasks. Relator's actions were that expected of a typical employee. For these reasons, the magistrate did not err when she found that relator knowingly committed fraud from January 31 to August 6, 2013.  Relator's objection is overruled.

{¶ 12} Accordingly, after an examination of the magistrate's decision, an independent review of the record, pursuant to Civ.R. 53, and due consideration of the commission's and relator's objections, we overrule their objections and adopt the magistrate's findings of fact and conclusions of law. Relator's request for a writ of mandamus is granted to the extent set forth in the magistrate's decision.

*Objections overruled; writ of mandamus granted.*

DORRIAN, P.J., and TYACK, J., concur.

_____

[Cite as *State ex rel. Dunlap v. Indus. Comm.*, 2016-Ohio-8131.]

# APPENDIX A

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| The State ex rel. Myong Dunlap, | : | |
| Relator, | : | |
| v. | : | No. 16AP-101 |
| Industrial Commission of Ohio and | : | (REGULAR CALENDAR) |
| Ryan Michael, Inc., | : | |
| Respondents. | : | |

## M A G I S T R A T E' S   D E C I S I O N

### Rendered on August 22, 2016

*The Bainbridge Firm, LLC,* and *Carol L. Herdman,* for relator.

*Michael DeWine,* Attorney General, and *Patsy A. Thomas,* for respondent Industrial Commission of Ohio.

### IN MANDAMUS

{¶ 13} Relator, Myong Dunlap, has filed this original action requesting this court issue a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order wherein the commission exercised its continuing jurisdiction over the motion filed by the Ohio Bureau of Workers' Compensation ("BWC") finding that she had been overpaid temporary total disability ("TTD") compensation, that the BWC was entitled to recoup that overpayment pursuant to the fraud provisions of R.C. 4123.511(K), and the commission's subsequent order denying her request that the

commission exercise its continuing jurisdiction to correct a mistake of law, and order the commission to find there was no overpayment and/or that she was not guilty of fraud.

Findings of Fact:

{¶ 14} 1. Relator sustained a work-related injury on October 15, 2008 and her workers' compensation claim has been allowed for the following conditions:

> Sprain left hip and thigh; sprain left ankle; lumbosacral sprain/strain; left ankle subtalar joint synovitis with edema; L4-L5 protruding disc; L4-L5 tear; substantial aggravation of pre-existing depressive disorder; sacroiliitis.

{¶ 15} 2. Relator received a period of TTD compensation based on her allowed physical conditions.  That period of TTD compensation was terminated when the commission determined that her allowed physical conditions had reached maximum medical improvement ("MMI").

{¶ 16} 3. On October 4, 2011, relator filed a C-86 motion requesting the payment of TTD compensation based on her allowed psychological condition.  Her motion was supported by medical documentation from Scott L. Donaldson, Ph.D., who opined that her allowed psychological condition prevented her from returning to her former position of employment.  Payments were awarded beginning November 10, 2010.

{¶ 17} 4. Following the granting of TTD compensation, a letter was mailed to relator explaining that her physician of record must continue to provide complete documentation of disabling condition and further provided as follows:

> You are not entitled to temporary total benefits if you meet any of the conditions below.

> [One] You return to any type of work for any employer.

{¶ 18} 5. Although her allowed physical conditions had reached MMI, relator continued treating with Charles May, D.O., who noted that she continued to complain of lumbar pain with radiation down the left hip and lower extremity to her toes.

{¶ 19} 6. Concerning her allowed psychological condition, there are several independent medical examinations in the record, including the following:

{¶ 20} (a.) Ken H. Tecklenburg, Ph.D., performed an independent medical examination to determine whether relator's claim should be allowed for a psychological

condition.  In his March 28, 2011 report, after discussing the medical evidence which he reviewed, including evidence pertinent to relator's allowed physical conditions and the psychological evaluation of relator's physician of record (Dr. Donaldson), Dr. Tecklenburg noted that relator self-related that her typical day involves staying at home, she avoids driving because of pain, does not frequent restaurants, is no longer active in church, and she avoids people because they are too nosey.

{¶ 21}  (b.) Paul A. Deardorff, Ph.D., examined relator to determine the percentage of permanent partial impairment due to her allowed psychological condition.  In his November 2, 2011 report, Dr. Deardorff discussed the medical evidence, noted that relator self reported that she does not leave home often, has no hobbies, noted that she is continually depressed, and finds little enjoyment in previously enjoyed activities.

{¶ 22}  (c.) Richard L. Barnett, Ph.D., examined relator and rendered an opinion regarding her percentage of permanent partial disability.  In his December 5, 2011 report, Dr. Barnett noted that relator self-reported that she does very little cooking because she cannot stand for very long, no longer enjoys many of the activities she formally enjoyed, does not like being around crowds and avoids standing in line, rarely goes anywhere but will occasionally go to church, becomes frustrated easily, and reacts in anger or by withdrawing.

{¶ 23}  (d.) Mark E. Reynolds, M.D., evaluated relator regarding the limitations of her psychological condition.  In his March 6, 2012 report, Dr. Reynolds discussed the medical records which he reviewed and opined that relator had not reached MMI.  He noted that relator was consistently described by most evaluators, including himself, as evidencing severe symptomology, and that the recommended treatment with antidepressant medications should proceed.  He opined that based on the severity of her psychiatric symptomology, she would be unable to return to her former position of employment despite any reasonable restriction or modification, and would likewise be unable to return to any other form of employment.

{¶ 24}  (e.) Rakesh Ranjan, M.D., conducted an independent medical evaluation concerning relator's limitations due to her allowed psychological condition.  In his October 22, 2012 report, Dr. Ranjan noted that relator self-reported that she does not cook or clean and does not pursue any hobbies, nor does she socialize or drive.  He further

opined that her allowed psychological condition had not reached MMI and that, in light of severe and debilitating psychological symptoms, she was unable to return to any gainful employment.

{¶ 25} 7. On July 12, 2013, the BWC filed a motion seeking to terminate relator's TTD compensation.

{¶ 26} 8. The matter was heard before a district hearing officer ("DHO") on August 7, 2013. The BWC's motion was granted based on the June 14, 2013 report of Dr. Tosi who opined that her allowed psychological condition had reached MMI and did not prohibit her from returning to her former position of employment. The DHO terminated relator's TTD compensation as of August 7, 2013, the date of the hearing.

{¶ 27} 9. The BWC's Special Investigations Unit ("SIU") received information from an anonymous source that relator was working at King J, a beauty supply store, and that she worked Tuesdays, Thursdays, Saturday, and some Fridays. The SIU conducted surveillance. The investigative notes provide, in pertinent part, as follows:

> 8/6/13 * * * - Commencing at 2:15 p.m., Plush and Fraud Analyst Lajuana Brooks (Brooks) entered the King J store located on Lockbourne Avenue and conducted an undercover operation. Upon entering the store, agents observed DUNLAP **standing** behind the front counter, working at the cash register. DUNLAP greeted the agents and introduced herself as "Mia." DUNLAP walked the agents throughout the store, assisting them with locating several items. At one point, DUNLAP moved and climbed a step ladder in order to reach a hairpiece. In the course of conversation, DUNLAP provided background and details about the products, and informed agents she worked three days per week - Tuesday, Thursday, and Saturday open to close. Brooks purchased a hairpiece and DUNLAP completed the transaction at the cash register, bagging the item and returning change to Brooks. Brooks asked DUNLAP to write down information pertaining to a hairpiece she was looking for that, according to DUNLAP, the store did not have in stock. Another Asian employee wrote the information down and then DUNLAP took that piece of paper and added her name, "Mia," along with the business name and phone number. The agents exited the store at approximately 2:33 p.m. with DUNLAP still inside.
>
> *It should be noted DUNLAP remained standing during the duration the agents were in the store.*

* * *

> 10/10/13 * * * - Commencing at 4:03 p.m. Koehl and Dearth
> entered the King J store located on Lockbourne Avenue and
> conducted an undercover operation. An Asian male at the
> front of the store confirms DUNLAP was working. DUNLAP
> exited from a room at the back of the store and assisted the
> agents. Dearth indicated she was looking to purchase a wig.
> DUNLAP assisted Dearth in locating and trying on several
> hairpieces; explaining each one and the difference between
> natural and synthetic hairs, how to care for each type, etc.
> DUNLAP informed agents she typically worked three days a
> week running the cash register and taking care of the money,
> and that currently she was training a new employee.
> DUNLAP told the agents she "does hair" but was not
> currently working as a stylist because she didn't have a salon.
> DUNLAP stated she does however keep her license current.
> DUNLAP confirmed she would put a hold on a hairpiece
> Dearth was interested in, and gave Dearth a business card.
> The agents departed the store at 4:40 p.m. with DUNLAP
> still inside.
>
> *It should be noted DUNLAP remained standing during the
> duration the agents were in the store.*

(Emphasis sic.)

{¶ 28} SIU agents interviewed James Lee, the owner of King J. Lee informed the agents that relator was not an employee, that she and his wife were best friends, and that relator came to the store because she was bored. When informed that the agents had witnessed relator helping customers and running the cash register, Lee responded that relator did operate the cash register and assist customers, and had been doing so for the past one to two years. However, Lee indicated that he did not pay relator.

{¶ 29} SIU agents contacted Lee's accountant who indicated that he had no payroll records for relator, but that it was possible payments had been made to her in cash, yet he had no record of those payments.

{¶ 30} SIU agents interviewed two employees of King J who both indicated that relator had worked there while they worked there, that she ran the cash register and assisted customers, but neither of them knew whether or not she was paid. Mariata Sylla indicated further that relator had told her that she had been working full time at King J

for two to three years, but was cutting her hours back because of back pain. Ashley McCormic indicated that, during the short time she worked there, relator was present almost, if not every day, that McCormic worked. Further, McCormic indicated that she left her job with King J because they paid her off the books and, to the extent they paid her with a check, they never took out any deductions.

{¶ 31} SIU investigators interviewed relator's physician of record, Dr. Donaldson, and provided him with surveillance video and employee statements. Dr. Donaldson indicated that relator did not tell him she was working at King J and that he would not have certified TTD compensation had he known she was working.

{¶ 32} 10. On October 27, 2014, the BWC filed its motion requesting that the commission find that relator had been overpaid TTD compensation from March 1, 2011 through August 7, 2013, and further asking for a finding of fraud.

{¶ 33} 11. The BWC's motion was heard before a DHO on November 24, 2014. The DHO concluded that relator had been overpaid TTD compensation because she was engaged in activities that were inconsistent with the claimed psychological inability to return to any form of employment. The DHO relied on the video surveillance which contrasted sharply with the C-84s and Medco-14s completed by Dr. Donaldson who indicated that she was unable to perform any work due to the allowed psychological condition and Dr. Donaldson's statement, after he viewed the surveillance video, that he would not have certified the period of TTD compensation had he known she was working.

{¶ 34} Thereafter, the DHO considered whether or not a finding of fraud was appropriate and concluded that it was not, stating:

> The SID conducted surveillance at King J on 08/06/2013, and undercover video that was obtained showed the Injured Worker working behind the front counter as a cashier. The Injured Worker also walked the SID agents through the store, helping them locate various items. This included standing on a stepladder for several minutes to retrieve a hairpiece, and bending over to look at products. The video depicts the Injured Worker effortlessly performing her physical activities without hesitation, and interacting with the agents in a professional and courteous manner. The Injured Worker provided details about different products, and told the agents that she worked three days a week, 10:00 A.M. to 8:00 P.M. She completed a cash register transaction

for the purchase of a hairpiece, and provided the agents with a slip of paper with her name and business number.

* * *

The Bureau of Workers' Compensation's request for a finding of fraud is denied. The prime facie elements of fraud are, (1) a representation, or where there is a duty to disclose, concealment of fact; (2) which is material to the transaction at hand; (3) made falsely, with the knowledge of its falsity, or with such disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the representation or concealment; and (6) a resulting injury proximately caused by the reliance. The District Hearing Officer finds that the Bureau of Workers' Compensation has not established all elements to a preponderance of the evidence.

The absence of remuneration factors into the issue of fraud. There is insufficient evidence in file that the Injured Worker was paid for her activities. The owner of the store, James Lee, told investigators that he did not pay the Injured Worker. He stated that his wife and the Injured Worker were best friends and that his wife would occasionally buy the Injured Worker dinner. Investigators also contacted Mr. Lee's business accountant, Sam Lee, CPA. Sam Lee indicated that the Injured Worker's name was not listed anywhere in the payroll records, or in any other documentation as having been paid by the business * * *. The SID also obtained the Injured Worker's bank account records from Fifth-Third bank from 10/03/2008 to 03/27/2013 * * *. There were no checks from King J that were deposited or cashed and no record of recurring cash deposits from 03/01/2011 through 08/06/2013.

The documents that the Injured Worker used to apply for ongoing temporary total disability compensation advised that she was not permitted to work while receiving temporary total disability compensation. However, the documents did not define "work" and did not indicate that even unpaid activities may sometimes be considered work. Based on the lack of proof of wages, and an insufficient showing that the Injured Worker recognized that her unpaid activities may have constituted work, the District Hearing Officer finds that a fraud declaration cannot stand.

{¶ 35} 12. Both relator and the BWC appealed and the matter was heard before a staff hearing officer ("SHO") on February 10, 2015. The SHO affirmed the prior DHO order in all respects, including denying the BWC's request for a finding of fraud. Specifically, the SHO stated:

> The Administrator obtained statements from the Injured Worker, from Mr. Lee, the owner of the store, bank records of the Injured Worker, and the statement of the Employer's accountant. There are no records of payments to the Injured Worker from Mr. Lee. There are records of payment to the other co-workers, typical of wages being paid by check. The Administrator sought evidence of payment, and did not find this evidence after aggressively investigating. This evidence supports the conclusion that the Injured Worker's statements, and the statements of Mr. Lee, that the Injured Worker was not paid are credible. While it is apparently true that Mr. Lee would occasionally take the Injured Worker to dinner, there is insufficient evidence to find that the Injured Worker received remuneration for her activities as a store clerk at King J.

> The Administrator points to case law which would support the conclusion that, in a proper case, activities may be inconsistent with an award of temporary total disability even in the absence of remuneration, and that in a clear case a fraud finding may stand. In particular, the Administrator points to language on some of the C-84s signed by the Injured Worker which specifically advise that in a case in which activities generate income for a third person, they may constitute work. A finding of fraud requires a finding of a representation or concealment which is made falsely. While the Injured Worker plainly did exaggerate the extent of her disability, and down play[ed] the extent of her activities, a full finding of fraud requires a full finding of false representation, and there is insufficient evidence to conclude the Injured Worker was subjectively cognizant of an obligation to inform either her psychologist or the Administrator of unpaid activities.

{¶ 36} 13. On March 13, 2015, both relator and the BWC filed appeals from the SHO's order.

{¶ 37} 14. The matter was heard before the commission on April 28, 2015. The commission denied relator's appeal, but granted the BWC's appeal. The commission agreed with the findings and analysis of the DHO and the SHO regarding the conclusion

that relator was indeed engaged in work activity which was inconsistent with her alleged inability to work due to the psychological condition. Additionally, the commission found that the work activity relator performed was not minimal and that it directly generated income for another entity.

{¶ 38} Thereafter, the commission addressed the issue of fraud and determined that the BWC had presented sufficient evidence of fraud, and ordered that the overpayment be recouped pursuant to the fraud provisions of R.C. 4123.511(K). The commission acknowledged that the earliest C-84s specifically asked relator if she was working to which she had responded no. However, the commission noted that the C-84 application was later modified by the BWC and specifically asked relator if she was working in unpaid activities that were not minimal and that directly earned income for someone else. The commission noted that relator responded that she was not. Specifically, the commission stated:

> The Commission finds the Injured Worker had a duty to disclose she was working while receiving temporary total disability compensation. The original C-84 applications specifically asked the Injured Worker if she was working, to which she answered "no." The C-84 application was later modified by BWC, and the application signed by the Injured Worker on 01/31/2013, asked if the Injured Worker was working in unpaid activities that were not minimal and directly earned income for someone else. The Injured Worker again answered "no." The Commission has found the persuasive evidence documents the Injured Worker was engaged in unpaid activities directly earning income for someone else. The Injured Worker ran a cash register and made sales generating income for King J. The Injured Worker concealed this information from the Administrator. The Commission further finds the Injured Worker had a duty to disclose to treating and examining physicians the true extent of her mental and physical functional capabilities as she clearly would have been aware of the activities she was performing.
>
> The concealment was material to the matter at hand because it enabled the Injured Worker to continue to receive temporary total disability compensation to which she was not otherwise entitled.

The Injured Worker is further found to have had knowledge of the falsity of the representations made to BWC. The original C-84 applications specifically asked the Injured Worker if she had worked in any capacity during the period of disability. The C-84 form did not ask if the Injured Worker was engaged in unpaid employment. The modified C-84 form, signed on 01/31/2013, specifically asked the Injured Worker if she was engaged in unpaid activities, yet the Injured Worker continued to deny such activities. The Commission finds the C-84 form is clear and unambiguous that the Injured Worker was not entitled to receive temporary total disability compensation if she was engaged in the activities she was performing, but she continued to knowingly deny she was working. Further, the Injured Worker knew she was misrepresenting to her physicians her functional capabilities as she clearly would have been aware of the activities she was performing.

The Injured Worker concealed her activities and the misrepresentations of her abilities were done with the intent of misleading her physicians into certifying temporary total disability and with the intent the Bureau of Workers' Compensation would rely upon the certifications of disability to pay temporary total disability compensation.

The treating physician and the Bureau of Compensation justifiably relied on the misrepresentation and continued to certify and pay temporary total disability compensation.

The State Insurance Fund, as well as all injured workers and employers who rely upon the State Insurance Fund, suffered an injury by the issuance of benefits to which the Injured Worker was not entitled.

The Commission finds the six elements of fraud are found to have been met, and the overpayment is to be recouped pursuant to the fraud provisions of R.C. 4123.511(K).

The Commission notes the Injured Worker did not attend the 02/10/2015 hearing, and thus no contrary or clarifying evidence was offered at hearing. All evidence has been reviewed and considered.

{¶ 39} The commission's order was typed May 18, 2015, but was not mailed until June 23, 2015.

{¶ 40} 15. On August 21, 2015, relator filed a motion asking the commission to invoke its continuing jurisdiction to correct a clear mistake of law which resulted from the commission's non-compliance with time requirements for the hearing of an appeal and the subsequent order as found in R.C. 4123.511(D) and (E), stating:

> Now comes the Injured Worker, by and through her attorney, hereby requesting that the Industrial Commission invoke it[s] continuing jurisdiction to correct a clear mistake of law, resulting from its noncompliance with ORC section 4123.511(E); wherein the legislature mandated that an appeal filed in response to a Staff Hearing Officer Order under subsection (D) must be heard within forty five days after the filing of the notice of appeal with the ensuing order published within seven days following the hearing. Neither statutorily prescribed mandate had been met. Therefore, the Injured Worker would respectfully request that the order published on June 23, 2015 be vacated and the underlying order published following the hearing held on February 10, 2015 be reinstated.

{¶ 41} 16. The matter was heard before a DHO on October 15, 2015. While noting that the commission's hearing was not held 45 days after the filing of the appeals and the commission did not issue its order within 7 days after the conclusion of the hearing, the DHO noted that the statute does not provide a remedy to relator for the failure of the commission to comply with that portion of the statute. Finding that there was no authority to provide the remedy requested, the DHO denied the motion.

{¶ 42} 17. Relator's appeal was heard before an SHO on November 24, 2015. The SHO affirmed the prior DHO order and denied relator's motion on the same grounds, stating:

> The Staff Hearing Officer finds the Injured Worker has failed to establish grounds upon which the Industrial Commission could assert continuing jurisdiction over the decision issued by the full Industrial Commission on 06/23/2015. Specifically, the Staff Hearing Officer finds the Injured Worker has failed to identify a mistake of law which can be remedied by R.C. 4123.511. While the Injured Worker accurately points out that the hearing by the full Industrial Commission was conducted one day outside of the 45 day time frame mandated in R.C. 4123.511(E) and the Commission's decision was issued beyond the seven day time frame set forth in that statutory section, the Staff Hearing

Officer finds the statute does not provide any remedy to the Injured Worker for a failure of the full Commission to comply with those statutory time frames.

Accordingly, the Staff Hearing Officer concludes the Industrial Commission is without authority to grant the relief requested by the Injured Worker which is that the decision, issued on 06/23/2015, be vacated and the underlying Staff Hearing Officer order, issued 02/27/2015, be reinstated.

{¶ 43} 18. Relator's further appeal was refused by order of the commission mailed December 30, 2015.

{¶ 44} 19. Thereafter, relator filed the instant mandamus action in this court.

Conclusions of Law:

{¶ 45} For the reasons that follow, it is this magistrate's decision that this court should deny relator's request for a writ of mandamus.

{¶ 46} The Supreme Court of Ohio has set forth three requirements which must be met in establishing a right to a writ of mandamus: (1) that relator has a clear legal right to the relief prayed for; (2) that respondent is under a clear legal duty to perform the act requested; and (3) that relator has no plain and adequate remedy in the ordinary course of the law. *State ex rel. Berger v. McMonagle*, 6 Ohio St.3d 28 (1983).

{¶ 47} Relator first argues that the commission abused its discretion when it refused to exercise its continuing jurisdiction to correct a clear mistake of law. Specifically, relator argues that because the commission did not hold the hearing within 45 days after the filing of her notice of appeal and failed to issue its order within 7 days after the conclusion of the hearing, the commission has a clear legal duty to exercise its continuing jurisdiction and to vacate the commission's order which found that she had committed fraud.

{¶ 48} R.C. 4123.511(E) provides, in pertinent part:

Upon the filing of a timely appeal of the order of the staff hearing officer issued under division (D) of this section, the commission or a designated staff hearing officer, on behalf of the commission, shall determine whether the commission will hear the appeal. If the commission or the designated staff hearing officer decides to hear the appeal, the commission or the designated staff hearing officer shall

notify the parties and their respective representatives in writing of the time and place of the hearing. The commission shall hold the hearing within forty-five days after the filing of the notice of appeal and, within seven days after the conclusion of the hearing, the commission shall issue its order affirming, modifying, or reversing the order issued under division (D) of this section.

{¶ 49} In the present case, both a DHO and SHO found that relator had been involved in work activities which were inconsistent with the receipt of TTD compensation and found that she was overpaid that compensation for the closed period March 1, 2011 through August 6, 2013. Thereafter, both the DHO and SHO determined that the BWC had not met its burden of proving fraud because there was insufficient evidence to conclude that relator was subjectively cognizant of an obligation to inform either her psychologist or the administrator of her unpaid activities at King J.

{¶ 50} Both relator and the BWC timely appealed the SHO's order on March 13, 2015. As such, relator argues that the commission was required to hold the hearing on the appeals no later than April 27, 2015, 45 days after March 13, 2015. Because the hearing was not held until one day later, April 28, 2015, relator argues that the commission's order must be vacated. Further, relator argues that the commission was required to issue its order within seven days after the conclusion of the hearing. The hearing concluded on April 28, 2015, and relator argues that the commission was required to issue its order by May 5, 2015. It is undisputed that the commission's order was typed May 18, 2015 and mailed June 23, 2015. Relator argues that the commission's failure to issue its order within seven days constitutes a second reason why the commission's order must be vacated and, as such, the earlier SHO's order finding that she did not commit fraud must be the commission's last word on the subject.

{¶ 51} In response, the BWC argues that the failure of the commission to hold the hearing within 45 days of the filing of the appeal and the failure to issue the order within 7 days of the hearing, did not deprive the commission of jurisdiction and further, the statute does not provide any relief, let alone the relief relator seeks here. The Supreme Court of Ohio discussed statutory language requiring agencies to comply within certain time frames in *In re Davis,* 84 Ohio St.3d 520 (1999). Specifically, the court stated:

It is true that where a statute contains the word "shall," the provision will generally be construed as mandatory. *Dorrian v. Scioto Conservancy Dist.* (1971), 27 Ohio St.2d 102, 56 Ohio Op.2d 58, 271 N.E.2d 834, paragraph one of the syllabus. "A mandatory statute may be defined as one where noncompliance * * * will render the proceedings to which it relates illegal and void." *See State ex rel. Jones v. Farrar* (1946), 146 Ohio St. 467, 471-472, 32 Ohio Op. 542, 544, 66 N.E.2d 531, 534.

But, even with "shall" as the operative verb, a statutory time provision may be directory. "As a general rule, a statute which provides a time for the performance of an official duty will be construed as directory so far as time for performance is concerned, especially where the statute fixes the time simply for convenience or orderly procedure." *Id.* at 472, 32 Ohio Op. at 544, 66 N.E.2d at 534. This is so "unless the nature of the act to be performed or the phraseology of the statute or of other statutes relating to the same subject-matter is such that the designation of time must be considered a limitation upon the power of the officer." *State ex rel. Smith v. Barnell* (1924), 109 Ohio St. 246, 255, 142 N.E. 611, 613.

*Id.* at 521-22.

{¶ 52} *See also, Hardy v. Delaware Cty. Bd. of Revision,* 106 Ohio St.3d 359, 2005-Ohio-5319, wherein the court stated:

" '[A]s a general rule, a statute providing a time for the performance of an official duty will be construed as directory so far as time for performance is concerned, especially where the statute fixes the time simply for convenience or orderly procedure.' " *State ex rel. Ragozine v. Shaker,* 96 Ohio St.3d 201, 2002 Ohio 3992, 772 N.E.2d 1192, P13, quoting *State ex rel. Jones v. Farrar* (1946), 146 Ohio St. 467, 32 O.O. 542, 66 N.E.2d 531, paragraph three of the syllabus.

*Id.* at 363.

{¶ 53} Finding that the statute here and the use of the word "shall" is directory, and finding that relator was not prejudiced by the one-day delay for the hearing and the subsequent delay for the commission's order, the magistrate finds that relator is not entitled to the relief she seeks.

{¶ 54} Next, relator argues that the commission abused its discretion by finding that the BWC presented sufficient evidence of fraud. A finding of fraud requires six specific elements: (1) a representation or, where there is a duty to disclose concealment of fact; (2) which is material to the transaction at hand; (3) made falsely with the knowledge of its falsity; (4) with the intent of misleading another into reliance upon the representation; (5) justifiable reliance upon the representation or concealment; and (6) a resulting injury proximately caused by such reliance. *State ex rel. Allied Holdings, Inc. v. Meade,* 10th Dist. No. 06AP-1029, 2007-Ohio-5010.

{¶ 55} In the present case, it is undisputed that the original C-84s which relator signed specifically asked her if she was working, to which relator replied that she was not. The commission specifically found that "[t]he C-84 application was later modified by BWC, and the application signed by the Injured Worker on 01/31/2013, asked if the Injured Worker was working in unpaid activities that were not minimal and directly earned income for someone else. The Injured Worker again answered 'no.' " Finding that there was persuasive evidence that relator was engaged in unpaid activities directly earning income for someone else, the commission found that she had a duty to disclose to her treating physician the true extent of her mental, physical, and functional capabilities, and that this concealment was material to the matter at hand.

{¶ 56} Thereafter, the commission determined that relator had knowledge of the falsity of the representations. Specifically, the commission stated:

> The Injured Worker is further found to have had knowledge of the falsity of the representations made to BWC. The original C-84 applications specifically asked the Injured Worker if she had worked in any capacity during the period of disability. The C-84 form did not ask if the Injured Worker was engaged in unpaid employment. The modified C-84 form, signed on 01/31/2013, specifically asked the Injured Worker if she was engaged in unpaid activities, yet the Injured Worker continued to deny such activities. The Commission finds the C-84 form is clear and unambiguous that the Injured Worker was not entitled to receive temporary total disability compensation if she was engaged in the activities she was performing, but she continued to knowingly deny she was working. Further, the Injured Worker knew she was misrepresenting to her physicians her functional capabilities as she clearly would have been aware of the activities she was performing.

{¶ 57} The commission found that relator was overpaid TTD compensation from March 1, 2011 through August 6, 2013 and, having found that she committed fraud, ordered that the entire award be recouped pursuant to the fraud provisions of R.C. 4123.511(K). The magistrate finds that the commission abused its discretion by ordering the entire award to be recouped pursuant to the fraud provisions.

{¶ 58} While the commission is the ultimate fact finder and is due some deference as to its factual findings, this court is not required to give such deference to the commission's handling of issues which are purely legal issues. The determination of fraud is a legal issue. The commission found that none of the C-84s which relator signed between March 1, 2011 and January 30, 2013 informed relator that if she was engaged in unpaid activities that were not minimal and which directly earned income for someone else, she was not entitled to continue receiving TTD compensation. Inasmuch as the commission specifically found that relator was not paid for the activities, it was not until she signed the modified C-84 on January 31, 2013 that it can be said that relator knew that her unpaid activities were precluded. As such, the magistrate finds that it was an abuse of discretion for the commission to find that relator committed fraud when she received TTD compensation between March 1, 2011 and January 30, 2013 because none of those C-84s informed her that her unpaid activities were improper. However, inasmuch as the C-84 form signed on January 31, 2013 and the rest of the C-84 forms that she signed between then and August 6, 2013 did contain that language, the magistrate finds that it was not an abuse of discretion to declare that portion of TTD compensation which relator received should be recouped pursuant to the fraud provisions. In so finding, the magistrate acknowledges that it is certainly conceivable that, unless the BWC sent claimants a letter warning them that the language in upcoming C-84s concerning their activities and continued receipt of TTD compensation was going to change, it is certainly conceivable that relator was signing C-84s in 2013 without reading them carefully because she may have had no reason to know that the language had changed. However, the magistrate is not in a position to make that finding.

{¶ 59} Based on the foregoing, it is this magistrate's decision that relator has not demonstrated that the commission abused its discretion when it declined to exercise its continuing jurisdiction because the time requirements in the statute are directory and not

mandatory. Further, the magistrate finds that relator has not demonstrated that the commission abused its discretion by declaring she was overpaid TTD compensation from January 31, 2013 through August 6, 2013. However, the magistrate does find that relator demonstrated that the commission abused its discretion by declaring that the entire amount of TTD compensation be recouped pursuant to the fraud provisions, and this court should issue a writ of mandamus ordering the commission to vacate that portion of its order finding fraud for the closed period of March 1, 2011 through January 30, 2013.

/S/ MAGISTRATE
STEPHANIE BISCA

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).